IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KATHY PAULK,

                  Plaintiff,                      CV-08-989-ST

        v.                             OPINION AND ORDER

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

                  Defendant.           

STEWART, Magistrate Judge:

Plaintiff, Kathy Paulk, challenges the Commissioner's decision denying her applications

for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits

under Titles II and XVI of the Social Security Act.  The court has jurisdiction under 42 USC

§ 405(g).  The parties consent to the jurisdiction of a Magistrate Judge to enter final orders and

judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

For the reasons that follow, the Commissioner's decision is affirmed.

**PROCEDURAL BACKGROUND**

1 - OPINION AND ORDER

Paulk filed previous applications for DIB and SSI on August 21, 2002, alleging disability due to major depression and anxiety with an onset date of July 16, 2002. Tr. 57.[1]  On October 19, 2005, the Commissioner granted Paulk's applications for a closed period of DIB and SSI benefits for the period between July 16, 2002, and August 1, 2004. Tr. 57-60.  The award of benefits was based on a mental disability. Tr. 59.  However, the Commissioner found that "[b]eginning with August 2, 2004, [Paulk] regained the mental capacity for work as testified at the [September 22, 2005] hearing." Tr. 58.

Four months after the decision on those initial applications, in February 1, 2006, Paulk filed the present applications for DIB and SSI.  She alleges disability beginning October 20, 2005,[2] based on depression, borderline personality disorder, bipolar disorder, suicidal ideations, and panic and anxiety attacks. Tr. 9, 104-08, 136-78.  Her applications were denied initially and on reconsideration.  After holding a hearing on May 19, 2008, Administrative Law Judge Charles S. Evans ("ALJ") issued a decision on June 27, 2008, finding that Paulk was not entitled to benefits.  That decision became the final decision of the Commissioner on August 7, 2008, when the Appeals Council denied Paulk's request for review. Tr. 1-3.  In this action, Paulk seeks judicial review of the Commissioner's decision.

///

///

## **STANDARDS**

---

[1]  Citations are to the page(s) indicated in the official transcript of record filed by the Commissioner on July 29, 2009 (docket #11).

[2]  The alleged onset date of this application falls one day after the ALJ's decision granting Paulk a closed period of disability based on her 2002 applications.

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  If supported by substantial evidence, the Commissioner's decision must be upheld, even if "the evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

///

///

///

///

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999):

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, then the claimant is not disabled.  If the claimant is not engaged in substantial gainful activity, then the Commissioner proceeds to step two.  20 CFR §§ 404.1520(b), 416.920(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  If not, then the claimant is not disabled.  If the claimant has a severe impairment, then the Commissioner proceeds to step three.  20 CFR §§ 404.1520(c), 416.920(c).

Step Three.  Because disability cannot be based solely on a severe impairment, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1.  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, then the Commissioner proceeds to step four.  20 CFR §§ 404.1520(d), 416.920(d).

Step Four.  The Commissioner determines whether the claimant is able perform work he or she has done in the past.  If so, then the claimant is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, then the Commissioner proceeds to step five.  20 CFR §§ 404.1520(e), 416.920(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  If not, then the claimant is disabled.  If the claimant is able to do other work, then the Commissioner must show a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can do, then the claimant is not disabled.  If the Commissioner does not meet this burden, then the claimant is disabled.  20 CFR §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id*.

## ALJ's DECISION

At the hearing on May 19, 2008, the ALJ received testimony from Paulk, her husband, medical expert John Clossen, Ph.D., and vocational expert ("VE") Patricia Ayerza.  Applying the five-step sequential inquiry, the ALJ found at step one that Paulk had not engaged in substantial gainful activity since October 20, 2005, the alleged onset date, and at step two that she has the severe impairments of major depressive disorder (recurrent and severe) and borderline personality disorder.  Tr. 11.  However, at step three he found that Paulk had no combination of impairments that meets or equals a listed impairment and has a residual functional capacity ("RFC") that will allow her to perform a full range of light work, but had:  (1) a mild short-term memory impairment; (2) a functional to moderately impaired ability to maintain concentration

based on her interest level and mood; (3) a level of alertness of 90% of what would normally be expected in a woman of her age without severe impairment; and (4) would miss up to one day of work per month. Tr. 13. Based on these findings, the ALJ concluded at step four that Paulk was capable of returning to her previous work as an office clerk and at step five also could perform jobs as a receptionist, information clerk, small products assembler, and cleaner/polisher. Tr. 16-17. As a result, the ALJ found that Paulk was not disabled within the meaning of the Social Security Act.

## STATEMENT OF FACTS

### I. Background Leading Up to Initial DIB/SSA Applications

Paulk was born in 1961 and completed the eleventh grade in June 1979. Tr. 150. In about 1980, she married Andrew Buck. Tr. 301. Their union, although reportedly marred with emotional and physical abuse toward Paulk, lasted two decades until Mr. Buck left Paulk and their two children. Tr. 466. At that time, Paulk was working as an office manager at an automotive repair shop, Pro Car Care, in Oregon. Tr. 117, 152. However, her ability to hold down that job largely depended upon the beneficence of her then-manager and now-pastor, Daniel B. Goodyear. Tr. 117. Paulk began to "cut" herself some time during the nearly two years from May 2000 to July 2002 that she worked at Pro Car Care. Tr. 117, 152. These incidents involve Paulk cutting her arms or legs with sharp objects severely enough to draw blood, require bandaging, and create scabbing and scarring, but not severely enough to require a visit to a doctor's office or hospital. Tr. 32. Paulk described that the cutting allows a "release of her pent-up anxiety and anger, and helps her to relax." Tr. 452; *see also* Tr. 24. However, "she feels disappointed in herself after self-mutilating and does not feel any relief." Tr. 428.

On July 16, 2002, Paulk was hospitalized for a week for "acute depression and acute suicidal ideation." Tr. 57. Her initial DIB and SSI applications were filed less than a month later, alleging disability commencing July 16, 2002.

## II.  Treatment in Missouri

In December 2003, Paulk moved to Missouri to live with friends. Tr. 300, 303. A few months later on March 10, 2004, at an initial visit with a psychiatrist, Phyll Zuberi, M.D., she reported a range of physical ailments, as well as a suicide attempt, migraines, and depression. Tr. 314. This prompted a psychiatric evaluation the following day. Tr. 300. Dr. Zuberi diagnosed Axis I major depressive disorder, recurrent and severe, without psychotic features. Tr. 301. While he found that Paulk had a number of the features of borderline personality disorder, he found her "longitudinal history" inconsistent with that diagnosis. *Id*.

For about the next year, Paulk received medications, including Wellbutrin, Lithium, Klonopin, and Gabitril, from Dr. Zuberi, and weekly outpatient counseling from Diana Bray, a licensed professional counselor. Tr. 264-99. In August 2004, she began working as an in-home health aide and planned to move out of her friends' home. On February 23, 2005, however, Paulk contacted her case manager to request admission into a psychiatric care facility in Joplin, Missouri. Tr. 261. Some time shortly thereafter, Paulk apparently moved into the Ozark Center, a semi-independent residential care facility, where she continued her treatment and counseling with Dr. Zuberi and Ms. Bray. Tr. 148, 248-56.

By mid-June 2005, Dr. Zuberi did not feel that Paulk met the criteria to remain at Ozark Center due to her higher level of functioning as compared with other Ozark Center patients. Tr. 248. In early July 2005, Paulk moved out of Ozark Oaks, temporarily living with Chris

Paulk whom she later married.  Tr. 246.  In the fall of 2005, Paulk traveled to California to attend

to the unexpected death of her father.  Tr. 238-39.  Upon her return to Missouri, Chris Paulk told

her she would have to move out of his apartment, and Paulk discovered that he had spent her

food stamp card.  *Id.*  Paulk moved into her own apartment.  *Id.*

       In late May or early June 2006, Paulk again moved in with Chris Paulk.  Tr. 406-07.  His

14 year-old niece also lived with them, and Ms. Bray talked frequently about how to contend

with the niece's "attention seeking" behavioral issues.[3]  Tr. 403-06.

       The last treatment notes with Dr. Zuberi are dated July 6, 2006.  Tr. 561.  At that time,

Paulk was planning her wedding and working on moving to a new apartment.  *Id.*  Although

Paulk was "stressed out and not sleeping well," Dr. Zuberi reported that Paulk was not suffering

from psychosis, mania, cutting incidents, seizures, delusions, suicidal or homicidal ideations, or

auditory or visual hallucinations.  *Id.*  Her "headaches [were] under good control with

Topomax," she reported decreased depression, had "[o]rganized and goal directed" thought

processes, and was "[a]lert and oriented x4."  *Id.*

       Paulk continued to work part-time as an in-home health aide until September 2006 when

she and Chris Paulk were married.  Tr. 466.  Paulk worked about 20 hours per week, including a

few hours in the mornings and a few hours in the afternoons.[4]  Tr. 118, 137-38, 152, 157, 165,

181.

///

///

---

[3]  Both Chris Paulk and his niece apparently have bipolar disorder.  Tr. 404, 561.

[4]  This work was not considered SGA.  Tr. 143.

### III.  **Return to Oregon**

In early 2007, Paulk moved back to Oregon.  There is no evidence that Paulk resumed working after she moved back to Oregon, although she apparently was planning on seeking part-time work.  Tr. 461.

On April 27, 2007, Paulk presented for a mental status assessment at LifeWorks NW, a community treatment center.  Tr. 464-72.  Paulk had run out of medication and reported suicidal thoughts.  Tr. 472.  Cynthia Romero, M.D., prescribed Lithium, Ativan, and Trazodone.  The medications helped somewhat, but did not prevent Paulk's depression, mood swings, and occasional racing thoughts.  Tr. 459.  At a follow up appointment on May 15, 2007, Dr. Romero found "[n]o overt evidence of psychosis" and noted that Paulk had "fleeting suicidal ideation but no plan."  *Id*.  On June 5, 2007, Paulk had "cut last week, but really [did] not feel suicidal." Tr. 458.  Paulk continued to visit LifeWorks NW for medication management.  Over the next eight months, she continued to report cutting incidents at each appointment, continuing through her last appointment in February 2008, three months before the May 19, 2008 hearing before the ALJ.  Tr. 448 (2/5/2008, seven or eight incidents in past 30 days), 450 (11/9/2007, three incidents over past two days), 452 (10/5/2007, three incidents in last three weeks), 454 (7/25/2007, incident three days prior), 456 (7/10/2007, started cutting again about two days ago).

### **LEGAL STANDARDS**

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F3d 1190, 1193 (9th Cir 2004).

Paulk contends the Commissioner erred by:  (1) improperly evaluating her testimony and the testimony of her husband; (2) improperly accepting the medical expert's testimony; (3) failing to fully develop the record; and (4) failing to pose complete and proper hypothetical questions during the hearing.  As a result, Paulk contends that the Commissioner's step four and five findings are in error.

## ANALYSIS

## I.    Lay Testimony

First, Paulk asserts that the ALJ improperly evaluated both her testimony and the testimony of her husband, Chris Paulk.

### A.  Legal Standard

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms.  *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996); *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986).  The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so.  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283.

In addition, the Ninth Circuit "ha[s] held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition." *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993) (citation omitted).  The import of lay testimony is the ability to observe the claimant outside the clinical setting, which provides insight into how the claimant's impairments affect her in her daily life and how they likely affect

her ability to work.  Thus, "[l]ay testimony as to a claimant's symptoms is competent evidence

that an ALJ must take into account, unless he or she expressly determines to disregard such

testimony and gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F3d

503, 511 (9th Cir 2003) (citations omitted).

### B.  Hearing Testimony

Paulk testified that her physical ailments include a knee that "acts up," plantar fasciitis, a

history of a cracked tailbone, and asthma.  Tr. 27.  These impairments make standing and

walking for long periods of time difficult, and prevent strenuous physical activities.  *Id*.  She can

walk about six or seven blocks before stopping, can stand on her feet for about an hour before

needing to sit down or lie down, and can sit for about an hour before needing to "shift sides."

Tr. 28.

With regard to the symptoms of her mental impairments, Paulk testified that her bipolar

disorder causes her mood to swing from high to low and interferes with her ability to

concentrate.  Tr. 22-23, 29-30.  She does not sleep well during manic periods, which happen two

or three times a month, and may not sleep for two or three nights at a time.  Tr. 22-23, 26.  She

feels "very agitated and uncontrolled urges" and "tend[s] to go into fits of rages," one of which

caused her to attack her husband with a knife.  Tr. 23.  At least once a month when she is very

agitated, frustrated, depressed, or lonely, she "cut[s] on [her]self."  Tr. 23-24.  She experiences

panic attacks two or three times a week when surrounded by a lot of people and feeling stressed

and under pressure.  Tr. 24.  Afterward, she may use her inhaler for her asthma or go to sleep.

*Id*.  She feels depressed almost all of the time, has suicidal thoughts on a daily basis, and some

days does not get out of bed.  *Id*.

Her husband, Chris Paulk, testified that her "odd activity," including severe mood swings, began when they were unable to afford Paulk's medications.  Tr. 31.  In contrast to Paulk's testimony of biweekly panic attacks, he testified that she has panic attacks about once a month when they go grocery shopping and he has to stay with her the whole time.  Tr. 33.  Paulk has cut herself "quite a few times," but not so severely that she had to be taken to a doctor.  Tr. 32.  She "shuts herself down" around other people and has "tried to throw [him] out on multiple occasions wh[en] she doesn't want to work something out."  Tr. 33.

**C.  ALJ's Assessment**

The ALJ cited no affirmative evidence of malingering to justify rejecting Paulk's testimony.  Thus, his rejection of her testimony must be clear and convincing.  As discussed below, the ALJ has met that burden.

The ALJ found Paulk's testimony concerning the intensity, persistence, and limiting effects of her symptoms "not credible to the extent [it is] inconsistent with the residual functional capacity assessment."  Tr. 14.  He noted Paulk's "quite involved" activities of daily living, including her ability to complete household chores, manage the care of a dog, and drive an automobile, which in turn allows her to perform a variety of household errands.  *Id*.  The ALJ also noted that Paulk spends time with friends and family, is independent with regard to personal hygiene and financial affairs, and has traveled to California since the alleged onset date.  *Id*.  The ALJ also found Paulk's testimony of "numerous subjective complaints" inconsistent with her conservative and routine treatment, noting her lack of significant periods of hospitalization, and positive response to medication.  *Id*.  These reasons are supported by the record and are clear and

convincing.  Accordingly, it was not error for the Commissioner to reject Paulk's testimony to the extent it is inconsistent with the RFC assessed by the ALJ.

The ALJ viewed Paulk's husband's statements "with caution" for a variety of reasons. However, the ALJ's observations that Paulk's husband has a "personal relationship" with Paulk, shares the same "financial distress" as does Paulk, and lacks "expertise . . . to offer an objective or functional assessment," (Tr. 15) are not legitimate reasons for discounting his testimony.  Lay witnesses are not expected to give expert testimony and marital relationships are by their very nature ones in which a person shares a personal and financial relationship with a spouse.  The ALJ must provide a reason more germane than simply the bare fact and incidents of the marital or other familial relationship to legitimately discount testimony by a spouse or other cohabitant.

However, the ALJ did provide a more germane reason by concluding that Chris Paulk's observations of Paulk's difficulties with fatigue, depression, interacting with others, and concentration conflict with Paulk's conservative treatment history and activities of daily living. Tr. 15.  "One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."  *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001) (citation omitted).  This reason is supported by the record which does reveal a conservative treatment history. Consequently, the ALJ did not err by rejecting Chris Paulk's testimony to the extent it is inconsistent with the RFC assessed by the ALJ.

## II.  Medical Expert Testimony

Second, Paulk challenges the ALJ's decision to accept the testimony by the medical expert, Dr. Crossen.

*///*

A.  **Dr. Crossen's Opinion**

At the hearing, Dr. Crossen, a licensed clinical psychologist, testified that he had reviewed Paulk's medical records, including those of Dr. Zuberi.  Tr.  35.  He specifically referred to Dr. Zuberi's notes indicating that Paulk was working 27 hours a week in February 2005 and was interested in pursuing a nursing career, an interest encouraged by Dr. Zuberi.  *Id*.  Dr. Crossen found no evidence of psychotic symptoms and no evidence of a bipolar condition reported in the record.  Tr. 36.  He believed that Paulk's case should be evaluated under the listing for major depressive disorder, "probably triggered by [Paulk's] marital estrangements and broken heart and added to by [her] borderline personality condition that was further triggered by these outrageous behaviors on her [now ex-]husband's part."  Tr. 36; *see also* Tr. 472.  He found "no record of mental health problems . . . since . . . March of '06, at which time things seemed to be on the upswing."  Tr. 37.

At the time that Dr. Crossen evaluated the evidence, he had none of Paulk's medical records after March 2006.  Tr. 37.  Following the hearing, he reviewed the more recent records and concluded that there was "nothing in the notes or opinions of Dr. Zuberi, the clinicians treating the claimant at LifeWorks Northwest or Richard Browning, PMHNP that alters my ratings of the degree of impairments hamper [sic] her ability to function in the four areas of the 'B Criteria' on the PRTF form as I articulated the ratings at the hearing."  Tr. 568.[5]  Paulk contends that it was error to accept this opinion because Dr. Crossen did not in fact articulate any ratings of the degree of impairments or functional level at the hearing.

---

[5]  A "PRTF" is a "Psychiatric Review Technique Form," used to evaluate mental impairments.  *See, e.g.*, Tr. 328-44.

Dr. Crossen evaluated Paulk's impairments as major depressive disorder under Listing 12.04. Tr. 36. The "B Criteria" rate the degree of certain functional limitations, including restrictions on activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. Only those impairments that result in "marked" or "extreme" limitations satisfy the functional criterion. *See* Tr. 338. Dr. Crossen testified at the hearing that he saw nothing in the record "towards getting worse and a deterioration of the condition in the [PRTF] towards marked impairments." Tr. 37. His follow-up letter indicated that the more recent medical records did not establish that Paulk was hampered in "her ability to function in the four areas of the 'B Criteria.'" Tr. 568. A fair reading of this testimony and follow-up letter is that Dr. Crossen found no evidence of any "marked" or "extreme" limitation in any of the "B Criteria." Thus, the ALJ did not error by accepting  Dr. Crossen's opinion for failure to articulate a degree of impairment or functional level.

Paulk also contends that the ALJ improperly accepted Dr. Crossen's testimony because Dr. Crossen did not evaluate evidence that Paulk engages in self-mutilation. Dr. Crossen testified that the records through March 2006 contained no reports of psychotic symptoms. Tr. 36. Paulk contends that self-mutilation is often described as being related to psychotic disorders. Given the repeated notations of "cutting" incidents in her medical records, Paulk asserts that both Dr. Crossen and the ALJ erred by failing to make the connection between her self-mutilation and a psychotic disorder or symptoms. This argument fails for two reasons.

First, Paulk's treating psychiatrist, Dr. Zuberi, also did not make this same connection. Despite a clinical picture that included reports of "cutting on herself," Dr. Zuberi diagnosed

major depressive disorder "*without* psychotic features." Tr. 301 (emphasis added). Later

treatment notes repeatedly reference an urge to cut or inflict other forms of harm, but here again,

the assessment was "no psychosis." Tr. 236, 242, 244 (clinching on teeth and biting on tongue

all the time), 250, 261-63. In short, Paulk's suggestion that her relatively minor acts of self

mutilation evidence "psychotic" behavior appears to have been rejected by all psychiatric

sources in the record. Second, the testimony concerning these "cutting" incidents does not

indicate that this behavior has impeded Paulk's ability to function in any significant way. In

particular, this evidence was known to both Dr. Crossen and Dr. Zuberi when they assessed

Paulk's functional limitations. As discussed above, Dr. Crossen found no evidence of "marked"

or "extreme" limitations to satisfy the "B Criteria." Similarly, Dr. Zuberi found no marked or

extreme limitations in any category when he completed a medical source statement (mental) on

August 7, 2006. Tr. 445-46. Finally, Paulk's husband testified that the "cutting" incidents have

required no medical treatment other than home-administered bandaging. Tr. 32. Nothing in the

record indicates that any such incident took place while Paulk was working or otherwise

imposed additional restrictions that should have been incorporated into Paulk's RFC.

Accordingly, this court finds no error in the ALJ's failure to further evaluate Paulk's self-

mutilating behaviors.

### B. Medical Source Statement of Richard Browning

Paulk also contends that the ALJ erred by rejecting the medical source statement of

Richard Browning, her treating psychiatric mental health nurse practitioner (PMHNP) at

Lifeworks Northwest. Mr. Browning saw Paulk only once on February 7, 2008, the final office

visit in the record. Tr. 448-49. On April 1, 2008, he completed a medical source statement,

indicating that Paulk is either markedly or extremely limited in all but three of 20 functional areas.  Tr. 474-75.  Although they do not exactly overlap, the functional areas in this medical source statement arguably overlap with the four areas identified in Part B of the PRTF.  Based on Mr. Browning's assessment, Paulk contends that it was error to find that the limitations imposed by her impairments did not meet or equal a listed impairment.

The ALJ gave "little weight" to Mr. Browning's medical source statement.  Tr. 15.  In particular, the ALJ noted that Mr. Browning "offered no objective support" for his findings and that Mr. Browning's "opinions conflict with [Paulk]'s conservative treatment history and activities of daily living," and that as a nurse practitioner, he is not an acceptable medical source.

During her one appointment with Mr. Browning, Paulk reported not taking one of her medications (Lamictal) for one month due to financial constraints.  Tr. 448.  She believed her increase in depression at that time was a result of the failure to take that medication which reportedly kept her "level."  *Id*.  Mr. Browning assessed major depressive disorder without psychotic symptoms, continued Paulk on Lithium and Ativan, started her on Lexapro, and instructed her to return in three months, or as needed, and to return to the clinic or call with any increase in symptoms or concerns.  Tr. 448-49.  Although they reflect a number of stressors and symptoms, nothing in Mr. Browning's treatment notes indicates the extreme limitations reflected in the medical source statement he completed less than two months later.  Thus, the ALJ's conclusion that Mr. Browning's medical source statement is not supported by objective findings is well founded.

A nurse practitioner is not within the range of medical specialties defined as an "acceptable medical source" for purposes of establishing that a claimant has a medically determinable impairment.  20 CFR 404.1513(a).  As such, Mr. Browning is not considered a treating source whose opinion may be entitled to controlling weight.  *See* Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939.  Moreover, as just discussed, it was not error for the ALJ to accept the opinion of Dr. Crossen who is an "acceptable medical source."  Therefore, to the degree that Dr. Crossen's opinion is inconsistent with the medical source statement of Mr. Browning, it was not error to reject Mr. Browning's opinion.

### III.  <u>Development of the Record</u>

Next, Paulk asserts that the Commissioner failed to fully develop the record.  "In Social Security Cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  *Brown v. Heckler*, 713 F2d 441, 443 (9th Cir 1983).  This duty exists even when the claimant is represented by counsel.  *Id*.  However, this duty is triggered by ambiguous evidence or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence.  *Tonapetyan v. Halter*, 242 F3d 1144, 1150 (9th Cir 2001).

Paulk contends that the ALJ erred by assuming that Paulk's ability to maintain concentration ranged from functional to moderately impaired based on her "interest level and mood," and by finding that Paulk's level of alertness is 90% of what would be expected in a woman of her age without severe impairment.  Tr. 13.  Paulk contends that she is much more limited, but cites no specific evidence regarding this issue.

In this case, there is no ambiguous evidence or inadequacy in the record triggering a duty to further develop the record.  The ALJ's finding concerning the level of functional limitation is

supported by the available PRT Forms showing only mild to moderate limitation.  Tr. 338

(October 2005), 342-43 (March 2006), 445 (August 2006).  Although it is difficult to quantify a

mild to moderate limitation, the ALJ's assignment of a 10% reduction in alertness is not

unreasonable.  Moreover, as discussed above, the ALJ did not err in rejecting the medical source

statement of Mr. Browning.  That medical source statement appears to be the evidence on which

Paulk relies to support her contention that she is significantly more impaired than the ALJ found.

Absent Mr. Browning's medical source statement, nothing in the medical record supports the

extreme limitations Paulk alleges.  Dr. Zuberi, who is an acceptable medical source and treated

Paulk on multiple occasions from early 2004 until July 2006, found no marked or extreme

limitations in any of the same areas of Paulk's functioning as were assessed by Mr. Browning.

Tr. 445-446.  In sum, a searching review of the record reveals no ambiguity or inadequacy in the

record which merits further development.

   Paulk also contends that the ALJ failed to develop further information concerning her

propensity to self-mutilate.  The record supports the conclusion that Paulk engages in self-

mutilation when the stressors in her life increase.  This is a long-standing pattern, traceable back

to some time between November 1999 and March 2002 when Paulk's first marriage collapsed.

However, the record also reflects that Paulk's urge to self-mutilate decreases as her stressors

decrease and is at least somewhat controllable using techniques taught by Paulk's counselors.

Furthermore, there is no ambiguity regarding the effects of Paulk's self-mutilation.  Her

"cutting" incidents require bandaging and create scars, but nothing in the record supports the

conclusion that the injuries interfere with Paulk's ability to work, require a visit to a doctor or

hospital, or otherwise interfere with the various functional areas rated by Paulk's treatment

providers.  Viewing the record as a whole, the evidence regarding Paulk's self-mutilating

incidents require no further exploration and provide no basis to conclude that Paulk is unable to

work.

///

///

## IV.  **Inadequate Hypothetical Questions**

Finally, Paulk contends that the ALJ erred by failing to pose complete and proper

hypothetical questions to the VE.  The sole basis of this argument is that the ALJ improperly

failed to incorporate a requirement that Paulk must "rest" for ten minutes after sitting or standing

for one hour as set forth in the RFC in the ALJ's decision.  *See* Tr. 13.  The VE asked the ALJ

how long the hypothetical claimant would need to "get up before she could go back to sitting," to

which the ALJ responded "[t]en minutes."  Tr. 40.  In addition, she could stand for an hour, but

then would require a "ten-minute change" before she could "go back to standing."  *Id*.  These

limitations are consistent with Paulk's testimony that she would have to "shift sides" after sitting

for about an hour.  Tr. 28.

This court agrees with the Commissioner that the evidence supports a limitation that

Paulk be able to change positions for ten minutes after sitting for an hour.  The language chosen

by the ALJ in his decision regarding a need to "rest" is poorly drafted.  Neither Paulk's

testimony nor any of the medical evidence supports a limitation that Paulk needs to cease all

activity for ten minutes every hour.  Instead, the record supports a need for a change of positions

after an hour of standing or sitting which is consistent with the medical conditions underlying

this limitation.  This court finds no error in the line of questioning that the ALJ proposed to the

VE and on which the VE's opinion was based.  Accordingly, this court finds no basis to

conclude that the Commissioner's step four or five findings are in error.

///

///

///


# ORDER

For the reasons stated above, the Commissioner's decision is AFFIRMED.

DATED this 12th day of March, 2010.

<div style="margin-left:40%">

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

</div>